H. A. Ross, Appellant, v. JOSEPH B. MYERLY, Executor, et al., Appellees.

No. 46909.

OCTOBER 15, 1946.

Herrick, Sloan & Langdon, of Des Moines, for appellant.

K. B. Welty, of Spirit Lake, and Bradshaw, Fowler, Proctor & Fairgrave, of Des Moines, for appellees.

BLISS, J.—The real estate involved is in the original plat of Manhattan Beach as subdivided and laid out in Government Lots 4, 5, and 6 on the shore of West Okoboji Lake, otherwise described as the West Fractional Half of Section 13, Township 99, Range 37, in Dickinson County, Iowa. The plat was filed on page 5 of Book 3 of Plats in the office of the recorder of said county. The platted ground is about three fourths of a mile long and about one fourth of a mile wide at its greatest width. To better understand the matters we will refer to, an outline map of a part of the recorded plat is set out, which contains the properties of the litigants and other lots in the vicinity. The recorded plat contains blocks designated by letters A to L and includes all of them.

The plaintiff owns Block L, the irregular tract which juts eastward into the lake, and also Block K, the circular tract immediately to the west of and separated from Block L by what is designated on the original plat and the recorded copy thereof as Lakeside Drive. This drive is not, in fact, a drive, but is a strip of ground about twenty feet wide, which has

never been improved as a drive or way, and is used largely by pedestrians. It extends in a general north-south direction the length of the plat, crossing the lots at an approximate right angle, and divides each lot into two parts. It also extends around Block K in a circle. But it is circular only on the plat and does not so appear on the ground. Extending along the west ends of the lots in Blocks A and B and along the west side of Block K is a street known, and so designated on the plat, as Manhattan Boulevard.

The property owned by the defendants—meaning Joseph B. Myerly and James W. Myerly only, as they have acquired the interests of the other defendants—is Lot 1 in Block B. It adjoins and lies immediately south of plaintiff's property, Blocks L and K. The part of Lot 1 which lies to the west of Lakeside Drive is one hundred feet wide at the Drive, 109 feet wide at the west end, and 210 feet long. There is no controversy about any of these dimensions as they so appear in the original plat and the recorded copy thereof. The north boundary line of this portion of the lot is the curved outer line of the circular drive around Block K.

The controversy between the litigants is over that part of Lot 1 which lies east of Lakeside Drive. The defendants contend that all of this part from the drive, for a width north and south of one hundred feet, eastward to the water's edge of the lake, or rather to the high-water mark, is a part of Lot 1 and is their property. Since the shore line or the bank of the lake along the water front of the greater part of the lot is rather abrupt and steep, there is little practical difference in the water's edge and the high-water mark. It is the claim of the defendants that the north line of this part of Lot 1 and the boundary between it and Block L is a line 100 feet north of and parallel to the south line of Lot 1 extending eastward from the east side of Lakeside Drive to the lake. The defendants claim title to and ownership of Lot 1 by a complete and unbroken chain of transfers and paper title from the United States Government down to and in themselves, and also independent title by adverse possession. In the trial below, for convenience and more ready reference, the boundary line

between Block L and the east part of Lot 1, as claimed by defendants, was marked on Exhibit A, the recorded plat of Manhattan Beach, by the letter o, and the boundary line, as claimed by plaintiff, was marked thereon by the letter x. They are so designated on our map. The part thereof bounded on the north by the line o, on the south by the line x, on the east by the lake, and on the west by Lakeside Drive, indicates the ground in controversy.

Plaintiff filed his petition on October 26, 1940. As amended, it alleged plaintiff to be the owner in fee simple of "Block 'L' in the plat of Manhattan Beach, Incorporated Town of Wahpeton * * * the southerly line of Block 'L' being a line from the easterly side of the Lake Side Drive to the lake shore, said line being parallel with the southerly line of Lot One, Block 'B' of said plat, and which, if extended, would intersect the southernmost tangent of the circular road known as Lake Side Drive which bounds Block 'K' in said plat." Attached to the petition is a plat, marked Exhibit A, showing the boundary lines of Block L and Lot 1 as plaintiff claims them to be. This plat, re-marked Exhibit C, was introduced in evidence. The south boundary line of Block L as alleged above in plaintiff's petition corresponds with the line x of our map.

It is also alleged in plaintiff's petition that he has held title to Block L since January 8, 1934, "and that he and his grantors have been in actual, lawful, open, continuous and notorious possession of all the said described real estate for more than ten (10) years last past, in good faith and under claim of right, and at all times under the open assertion of being the fee simple owner of said property and entitled to such possession, and in open defiance and denial of any and all adverse claims and title thereto." Plaintiff further alleged that on or about 1935 the defendant, Joseph B. Myerly, whom we will hereinafter refer to as J. B. Myerly, wrongfully constructed a boathouse on Block L. Other matters were alleged and other relief was asked, which, because of our determination of the appeal, need not be further adverted to.

Defendants filed answer denying plaintiff's ownership of

Block L, because of insufficient information. They admitted the construction of the boathouse in 1933 near the north line of .Lot 1, with the knowledge of and without the objection of plaintiff, but deny that it is upon any part of Block L. They specifically deny that plaintiff or his grantors have ever been in possession of Lot 1, as alleged, or have ever asserted ownership or title or any claim of right to any part of Lot 1. They specifically deny all other allegations of the petition as amended. Defendants affirmatively allege that the defendant J. B. Myerly and his father, Joseph I. Myerly, hereinafter referred to as J. I. Myerly, acquired title to Lot 1, by warranty deed dated March 22, 1919, of record in the county recorder's office in Deed Record Book S, page 236; that said ''Lot 1, Block B of the Plat of Manhattan Beach, at the time of the purchase * * * consisted of a lot on the west shore of West Okoboji Lake, the west end of which abutted upon Manhattan Boulevard and was 109 feet wide; the east end of said lot extended to West Okoboji Lake, and was 100 feet wide; that said lot was traversed in a northerly-southerly direction by a public walk known as Lakeside Drive, 20 feet in width, said drive traversing said lot at a point approximately one third of the distance from the east end to the west end thereof; that said lot comprised the area designated as Lot 1, Block B, on defendants' Exhibit 'A,' hereto attached, and by this reference made a part [hereof].'' The Exhibit A attached to the answer is an outline drawing of part of the recorded plat showing Blocks K and L and Lot 1, Block B, with the said line o indicating the boundary between Block L and Lot 1 east of Lakeside Drive. Defendants also allege that they and their grantors in interest are and have been at all times for more than ten years last past in quiet and peaceable possession thereof, which possession has been open, notorious, and continuous, in good faith, under color of title and absolute claim of right, title, and ownership, and as the fee owners thereof, without any objection whatever from the plaintiff or from any other person whomsoever.

The trial began on September 27, 1944. Plaintiff offered in evidence an abstract of title to Lot 24, Block A, Block K, and Block L showing unbroken chain of title from the United

1132

States Government to the last certification of the abstract on September 15, 1941, in himself. This abstract shows that J. I. Myerly, father of defendants, who had an undivided one-half interest in Lot 1, Block B, at his death on February 28, 1939, obtained title, by various deeds in the fall of 1900, to said Blocks K and L and other property in the plat of Manhattan Beach, all of which he conveyed in December 1900, to the Manhattan Hotel and Land Company, of which he and two others were the incorporators. This company owned the property until August 1911. In August 1915, A. J. Harkins became a part owner of Blocks K and L and Lot 24 of Block A and retained an interest until he sold it May 25, 1920. The plaintiff obtained title to said property by deed from the receiver of the Bank of Paullina, Iowa, on November 27, 1929. He sold the property on April 1, 1930, and on January 8, 1934, received a sheriff's deed therefor in a mortgage-foreclosure proceeding. In the deed the property was described as in the original plat of Manhattan Beach as shown and platted on the records of Dickinson County, Iowa.

The plaintiff failed to establish the allegations of his pleadings by which he claimed title to or ownership of the land in controversy by adverse possession for ten years. He had title to the land less than ten years when he instituted this action. There was no proof of any claims or conduct on the part of his predecessors in title which even tended to support these allegations. His conduct and claims, and any so-called possession or control over the property, fell far short of proving this alleged issue. He testified that he had had some weeds pulled, grass mowed, and shrubbery trimmed east of the drive. Here are the chief parts of his pertinent testimony:

"Q. Who did you have cut any poison ivy between the lines X and O on the plat, Exhibit 'A' [the recorded plat]? A. I hired the man that is renting the boathouse from Mr. Myerly do it. He said he wasn't afraid of it, so I hired him to pull it by hand. There is poison ivy all along that bank where the boathouse is, and I didn't want the kids going and getting in it. I hired him to pull it. I wanted it pulled by the roots. Q. All right. How many different years did you have him cut ivy there? A. Just the one year. Q. What

other occupation or use have you ever had of the area between lines X and O? A. None, other than our people had access to it. Q. Yes, sure. A. The same as a lot of our other vacant property between cottages and around cottages. Q. Mr. Myerly's people had access to your beach, didn't they? A. They certainly did. * * * Q. You are not conceding he owned your beach out on the point merely because his people came down there, are you? You don't consider that gave him possession of your beach, do you? A. No, sir. Q. What else? What other manner or way did you directly or indirectly assume actual physical control, and possession, and use, and occupation of this area? A. I never dreamed that it was necessary as long as I had papers that gave me the property, I never assumed it was necessary to do such a thing. Q. Will you answer the question, please * * * A. By mowing the lawn in that immediate area. * * * Q. You never mowed any lawn, did you, to the south of line O on that plat? A. I would say we did. Q. How much? A. Not very much. Q. Well, how much? A few feet? A. Yes, ten or twelve feet. Q. Yes. In other words it is true that there is no fence between these properties at that point and you both mow up to the line and perhaps once in a while each of you mow across the line so there aren't any weeds left right on the line. Is that correct? A. That might be so. Q. Yes. You don't purport to tell the Court that consistently, now, you have mowed any substantial amount of lawn to the south of line O, do you? A. No, because there isn't any substantial amount south of that line. * * * It may also be true that Mr. Myerly and his helpers have also mowed that same area and together we have kept that clean. I never mowed the lawn myself but I assumed my man was keeping it clean. I have never seen him at any time south of line O, not particularly mowing, but I know he has cleaned weeds out of there and poison ivy. * * * Q. Let me ask you again, then, what actual physical possession and what control did you assume over the area between lines X and O? A. There wasn't any control to be made. It was just a piece of ground there that was lying there and it was steep, and there was brush and weeds on it the same

as a lot of that property has on it up there. Q. Did you pay this man Muntz for pulling ivy out of there? A. Yes, sir. Q. Mr. Muntz is the tenant for Mr. Myerly, isn't he—A. Yes, sir. Q. (Continuing) and rents the boat livery down there? A. Yes, sir. Q. And has since in 1939? A. Yes, sir. Q. Isn't it a fact, Mr. Ross, that this man Muntz has used the area on the beach between lines X and O on the plat, Exhibit 'A,' for the operation of his boat business, and isn't it true that that has been the case since 1939 and continuously? A. I would say yes. Q. Isn't it also true that prior to the time that Mr. Muntz leased this boat rack down there that Mr. Myerly had other tenants who operated boats and maintained this boathouse or boat business from this same location? A. I would say that would be true from 1935.''

Plaintiff has said little, if anything, about this issue of his adverse possession, in the presentation of the appeal either in oral or printed argument. We might fairly treat it as waived. But we have preferred to consider the issue on whatever merit it has. Our conclusion is that it is without merit.

The next matter for determination is whether the line O or the line X is the south line of Block L. This is largely a question of fact and requires further reference to the evidence. Defendants' abstract of title to Lot 1 shows the filing of the plat of Manhattan Beach by the Manhattan Beach Company on July 9, 1892, and a warranty deed by the company conveying this lot to Hurlbut-Ward & Company.

The latter grantee on January 20, 1897, executed warranty deed of the lot to C. C. Cole, trustee, describing it as:

"Lot One (1) Block 'B,' Manhattan Beach, West Lake Okoboji, Iowa, said lot *being one hundred feet front by about three hundred feet deep from the lake front,* together with all appurtenances thereto belonging, including, cottage thereon of seven rooms with a sitting room, dining room and kitchen furniture.'' (Italics supplied.)

The abstract also shows that on July 30, 1903, C. C. Cole, trustee, conveyed the lot by the same description just noted above to Carrie S. Hurlbut. She gave a mortgage on the property on August 23, 1912, which was foreclosed and the

property sold by the sheriff November 18, 1914, and sheriff's deed executed to M. E. Sherman on February 10, 1916. Sherman executed a warranty deed of the property on March 22, 1919, to J. I. Myerly and J. B. Myerly, the defendant, describing the property as:

"Lot one (1) in Block 'B' of Manhattan Beach as the same is known and platted on the records of said county and located on the west shore of West Okoboji Lake."

J. I. Myerly and J. B. Myerly had equal undivided ownership in the lot and upon the death of the first named J. B. Myerly became the owner of an undivided three fourths of the lot and the defendant J. W. Myerly became the owner of the remaining undivided one fourth. J. I. Myerly, the father, who was a lawyer, had a permanent home in Block A of Manhattan Beach, just north of plaintiff's property, in which he lived the year round from 1918 until his death in 1939. J. B. Myerly first acquired ownership in the plat of Manhattan Beach about 1912 when he became the owner of an undivided one-sixth interest in the entire plat. The Manhattan Beach Company owned the platted ground. At its request, G. B. Wicks, Jr., a surveyor, of Polk County, Iowa, surveyed and platted the ground and prepared a paper plat thereof, with figures thereon indicating the dimensions of the lots, streets, drives, and other distances in feet and tenths. These matters are shown by the surveyor's certificate on the plat dated May 20, 1892. On the plat is the written dedication of the plat signed and acknowledged on July 5, 1892, by the officers of the proprietor. The seal of the Dickinson county notary is affixed. On the plat are the certificates, required by statute, of the recorder, auditor, and treasurer of Dickinson County, Iowa, bearing date of July 9, 1892. The verity of the signatures and handwriting of the notary and these officers was shown. The plat is neatly and accurately drawn, with close approximation to the designated scale of "200 ft. to inch."

J. I. Myerly obtained possession of the plat at the time he became the owner of Manhattan Beach. He and J. B. Myerly operated the large hotel building on the beach of Block

L for several years until they disposed of it. It was a popular summer resort for many years until torn down by plaintiff and reconstructed into cottages. This original plat of Manhattan Beach was framed under glass and hung on the wall of the office of the hotel, within the view and access of the public, and many people interested in properties along the beach and vicinity came and examined it. The defendant J. B. Myerly obtained possession of the plat from his father sometime before the latter's death. It was received in evidence as defendants' Exhibit 2.

It was from this original plat that the copy thereof, recorded and filed in Plat Book 3, on page 5, was made. The page of the plat book—26 x 21 inches—of heavy paper reinforced by a light canvas cloth, made tracing of the original plat impossible. The original plat, on paper of ordinary weight and thickness, was then superimposed on the blank page of the plat book, and the two apparently were secured together with tacks. A pin or other like instrument was then used to so puncture both papers at the corners and lines on the original plat as to permit the reproduction of its outline on the page of the plat book by drawing lines connecting the perforations. It is much easier to draw an original plat than to reproduce it, especially in the crude manner in which it was done in this instance, and it is not surprising that the duplication was not exact and that there were omissions and errors in lines and figures on the recorded copy. This page of the plat book, with copy of the plat thereon, was put in evidence by the plaintiff as Exhibit A. Exhibit 2, the original plat, because of being folded for many years, is somewhat frayed and torn at the folds, and a part of Block L just above its south boundary, as claimed by defendants, is missing, although a part of the line, at its west end, marking that boundary between Block L and Lot 1, is clearly shown on the original plat. It is this boundary line that is marked as o on our outline map. No line marking the south boundary of Block L, as alleged by plaintiff in his petition and as contended by him to be the true line, appears on the original plat. In other words, the boundary line claimed by defendants and designated as o in the trial and on this appeal is shown upon the original plat in part, but the bound-

ary line claimed by defendants and designated as x is not shown on the original plat. Both the recorded copy of the plat of Manhattan Beach and the original plat thereof, and other exhibits, have been certified to this court. The original plat at some time was reinforced and protected from further injury by being pasted on a heavier paper. This plat was placed under a glass and sealed with tape before certification to this court. The trial court had no question of its verity. In our judgment no other conclusion can be reached. It is apparent that the drawing of this plat and the placing of the writing, letters, and figures thereon were the work of one person. We question whether that is true of Exhibit A, the recorded copy. When it was offered in evidence there was a line on it corresponding to line o, and also a line on it corresponding to line x. Plaintiff offered some testimony that the line first mentioned was not placed there when the recorded copy was made; that it was made in recent years; that it is straighter than most lines on the recorded plat and in different ink. Defendants have offered no opinion as to when the line was made. Their contention is that there was a line marked at that place on the original plat and that the line on the recorded plat rightly and correctly duplicates it. Defendants do insist that the line on the recorded plat corresponding to line x is an improper interpolation and in all probability was not made when the plat was placed of record. A number of reasons support this conclusion. First, and most important, it represents a line that was never on the original plat, and the making of that line, whenever or by whomsoever done, was wrongful and a potential injury to an owner of Lot 1. Plaintiff has offered no sound or satisfactory answer to this. Second, there is no dimension or distance noted on the original plat, nor on the recorded plat, by which to locate or to determine the position or termini of such a line. The width and the length of each lot in Block B, both on the original and the recorded plats, are indicated by figures along and on the inside of the sides and ends—the distances between the corners. If the draftsman of the original plat had placed a line thereon corresponding to x, thus limiting the width of Lot 1 east of the drive to the distance between x and the south line of Lot 1, he

likely would have placed figures on the plat definitely designating the number of feet of that width or dimension. He would have shown the distance between the west end of line x and the west end of the south line of the part of Lot 1 east of the drive. In no other way could line x be definitely placed. Since no such dimension or distance is given on any plat, it is a most reasonable inference that the draftsman of the original plat never placed nor intended any line corresponding to x to be placed on the plat. Third, in order to prepare his petition in this action, plaintiff employed the assistant Dickinson county engineer to find evidence on the ground that line x was the south line of Block L. This engineer, from his survey, prepared the plat, Exhibit C, which was attached to plaintiff's petition. He was the only witness who made any attempt to definitely locate the south line of Block L, as claimed by plaintiff, either on paper or on the ground. It was in his mind the idea was born that the south line of Block L was one which if extended westward from the east side of the drive would be tangent to the circular drive around Block K and parallel to the south line of Lot 1. He had no tangible basis for this idea. It was imagination or conjecture. He had no dimension or distance noted on any plat or record. He had no stone, stake, monument, or marker to guide him. It is true there was a line approximately corresponding to x on the recorded plat but there was nothing to indicate where it was on the ground. Certainly there was nothing to indicate that this line was 51.8 feet north of the south line of Lot 1. He ascertained that fact by actual measurement on the ground after he ran his imaginary tangent. It was then that he placed an iron pin on the east line of the drive, that distance north of the south line of Lot 1, at a place where he had found no stake nor any evidence that one had ever been there. Just why Lot 1 should have but a lake frontage of 51.8 feet when its width as marked on the plat is 100 feet, while Lot 2, abutting on the south, and Lots 3, 4, 5, 6, and 7, each with a width of 60 feet, should each have 60 feet of water front, is not clear nor explained. His testimony, immediately following, sustains our conclusions:

"Q. Is there anything on any of the plats, Exhibit 'A'

\* \* \* or any other plat that you have examined, that places line x on Exhibit 'A' \* \* \* with reference to the south line of Lot 1 as it extends to the water's edge? A. There is nothing on any plat of record I know of that fixes the exact location of that line. Q. Is there anything in the records \* \* \* that shows the location of line X on \* \* \* Exhibit 'A' [the recorded plat] \* \* \* that tells you where that line is with reference to the south line of Lot 1 by feet, or physical monuments, or what-not? A. Not to my knowledge. There is nothing shown on Exhibit 'A' \* \* \* Q. Is there anything in the platted record of Manhattan Beach shown on Exhibit 'A' or Exhibit 'B' which makes reference to a line parallel with the south line of Lot 1 and tangent with the southerly arc of the circular drive designated Lakeside Drive on these plats? A. There is nothing that shows that it is. Q. There is nothing in the record that shows or makes any mention of an extension of a line or a line originally that should be tangent to the southerly side of the circle around Block K? A. No, there is nothing. \* \* \* Q. If there is nothing in the record or on the recorded plats in the county to designate the \* \* \* line X on these plats, why or by what means or reasoning did you put line X where you have put it? A. From all I could learn from the plats of record \* \* \* apparently the intent was for that line to be located in that position or location. Q. Will you show us something in the plats or the records of this platted area that would lead you to that conclusion? A. The only thing that I can show you would be the line prolonged would strike a tangent with the southernmost point in this arc and it would be parallel with the south line of 1.''

At the request of plaintiff this engineer had made a survey in 1935 similar to the survey in 1939. In fact, the latter was but a rechecking of his previous survey. Of it he testified:

''When I first made a survey out there I did at that time place pins or stakes or monuments which would designate the ends of line X. Q. At that time did you find any other monuments to designate those points? A. Yes, I believe there were a good many points in along there, the westerly side of the

drive, and also the back of the lots along Manhattan Boulevard. I believe most of those lots are marked by steel pins or short cement posts. When I first located line X *I did not find any steel pins or cement posts to designate that line. I did not find any monument of any kind which would tend to place line X.* [Italics supplied.] Q. I refer you to Exhibit 'C' [plat made a part of plaintiff's petition, and drawn by the witness] and to point Y, which is the point at which the outer arc of the circular drive intersects with the westerly line of the twenty-foot walk on the north side of Lot 1, and ask you if there is a permanent marker of some kind there? A. At the time I was there there was a gas pipe marking that corner. Q. At the time you were there on either of these occasions did you find a monument of some kind which marked the position on Exhibit 'C' which I will designate by the letter T, being the point where the south line of Lot 1 intersects the westerly side of the twenty-foot walk? A. Yes, it shows an iron pipe there.''

It definitely appears from the testimony of this engineer witness of plaintiff that he found many permanent stakes and monuments marking the lines and corners of lots in the vicinity of the tract and boundary in controversy, but he found no marker or ''monument of any kind which would tend to place line x'' on the ground. This witness also found permanent markers at the points Y and T on the plat, Exhibit C. T, on that plat, is at the southeast corner of that part of Lot 1 lying west of Lakeside Drive. The iron stake at that point is directly west across the drive from the west end of the south line of the part of Lot 1 extending east to the lake, which line appears on all of the plats.

Y, on the plat Exhibit C, referred to by this witness, is at the northeast corner of that part of Lot 1 lying west of Lakeside Drive. The permanent stake found by the witness at that point is directly west of the west end of the line extending east to the lake, part of which line is shown at that place on the original plat and part of which is torn from that plat. In other words, the metal pipe at Y is directly west across the drive from the west end of the line o which defendants claim as the north boundary of Lot 1 east of the drive. Since the

stake at T concededly marks the south line of Lot 1 east of the drive it is very improbable that the stake at Y does not mark the north line of Lot 1 east of the drive.

J. B. Myerly testified that he found many of the old surveying stakes. One at the northwest corner of Lot 1 next to the circular drive and one at the northeast corner of the lot at the circular drive. Also one at the southeast corner of the lot west of the drive and at corners of Lot 2, Block B, which he owns.

Line o is at a place where one would expect to find it. It is shown on the original plat and it is marked on the ground. While line x is not where one would expect to find it, it is not shown on the original plat, and it is not marked by any monument or stake on the ground. These circumstances alone establish the failure of the plaintiff to prove line x to be the south boundary of Block L.

There are numerous other facts and circumstances in the record which sustain this conclusion. There is no evidence that any owner of Block L prior to plaintiff ever took possession of or claimed the tract in controversy to be a part of Block L. Such evidence as there is affirmatively shows the contrary. For many years before plaintiff acquired title to that block a boathouse, later converted by plaintiff into a recreation cottage, was located a short distance north of line o; a cement sidewalk had been constructed from the north down to the building; later the building was moved north so that thereafter and at the time of the trial the building extended north over the end of the sidewalk two or three feet, making it reasonably inferrible that the building was moved north to avoid encroaching on Lot 1. There was evidence that the south side of this boathouse is but a short distance north of line o.

Mr. A. J. Harkins, who owned Block L for three years and had possession of it for four years prior to 1919, testified that he "was familiar with what was known as the lot lines between Block L of the plat and Lot 1 of Block B of the plat." He testified:

"A. Well, the boundary line as I understood, while I owned the property between Lot 1 and Block L was the south

edge of that little boathouse that sat at the end of that walk. * * * It [the boathouse] stood at the [south] end of the sidewalk between Block L and Lot 1. * * * The sidewalk I refer to was on Block L. * * * The [south] line [of Block L] was at the south edge of the boathouse. * * * Q. In other words, the south end of this boathouse that was on Block L was right up to the line between Block L and Lot 1? * * * A. I always recognized the south end of the boathouse as the line.''

With reference to the stairway down the bank of the lake in front of Lot 1, he testified:

''I mean the steps that went down the bank from the upper part of the lot down toward the lake. The stair I refer to was perhaps eight or ten feet south of the south end of the boathouse. It was there when I first acquired the property. The same stair was there as I recall it, except for wear and tear when I left the property.''

For some years before 1919, when J. I. and J. B. Myerly acquired Lot 1, there were steps leading from the level ground at the top of the steep bank of the lake at the front of Lot 1 down to the beach. These steps were a short distance south of the location of line o. These steps were used by the occupants of Lot 1 in going to and from the shore line. They became dilapidated and unsafe and in 1925 or 1926 the Myerlys tore them down. Thereafter flat stones were placed on the dirt steps remaining after the wooden ones were torn away.

Mrs. Carrie S. Hurlbut, of Des Moines, owned Lot 1 and occupied it in the summer for several years. She testified:

''We acquired that property in 1898. * * * I went up there * * * in 1899 and occupied it every summer from then on. The last time I occupied it up there was in 1910. I think I rented it for two or three years after that. * * * the lot along the shore was 100 feet. * * * it was an oblong lot, as most lots are, and it did start from the lake and ran to the westward. * * * There was a stair part way down to the lake. It was a little north of the center of the lot. * * * While we owned this Lot 1 we used the lakeshore end of it. We oftentimes went down there and went into the lake and walked

around to the dock and to the beach where other bathers were. Our help went down there and bathed in the lake in front of this cottage. While we owned and controlled this Lot 1 no one occupied or used the east end of the lot except us * * * I never undertook to locate any lines or monuments or anything of that sort up there. I knew what my lines were on my lot, that was all that interested me and that didn't very much.''

Mrs. Hurlbut's son, who spent summers at the cottage with his mother from the time he was eight years old until he was twenty, remembered the old steps down to the lake shore.

J. B. Myerly testified:

''During the period that I have owned properties in the plat of Manhattan Beach I have been familiar with the lot lines, particularly * * * of Lot 1 * * * and also particularly with reference to the south line of Blocks L and K of the plat. * * * I have been personally familiar with the general property locations and lot boundaries * * * of Manhattan Beach since my father first acquired the property in 1896 or thereabouts. I have been personally interested in Lot 1 of this plat only since my father and I acquired it in 1919. * * * We have occupied * * * and used it and taken care of it and improved it some from year to year since 1919.''

From his testimony it also appears that the house on Lot 1 in 1919 was rented to tenants for two or three years and then torn down and four cottages were built on the lot and a large garage and apartment building were built on the west end of the lot. The east part of the lot was improved by building a platform on top of the bank and a stairway from it leading down to the shore line two or three feet north of the south line of the lot. A dock was built at the foot of this stairway. When the lot was acquired there was a stairway extending down the bank to the water on the north side of the lot near the line designated as line o on the recorded plat. This stairway was torn down about 1926 or 1927 and was replaced some years later with a new stairway in approximately the same location. From 1928 to 1933 Elwood Myerly, a son of J. B. Myerly, operated a boat livery from boat racks on the

beach immediately south of the line o. These racks were kept at the water's edge in the summer, and were drawn directly back out of reach of the ice during the winter. J. B. Myerly's measurements of Lot 1 showed it to be 100 feet wide at the lake shore, 109 feet wide on Manhattan Boulevard, and approximately 300 feet long from the lake west to the boulevard. In May 1933 J. B. Myerly constructed a small boathouse and a dock, about where the boat racks had previously been kept, and just south of the line o. This boathouse was used in connection with a boat livery operated continuously thereafter by the defendants or their tenants. The north side of the boathouse is 22 feet from the line o, and the stairway is between the boathouse and said line. The boathouse of the plaintiff is a few inches directly north of line o and abuts upon it. This boathouse has been in this approximate position since before 1912. During all of the time since 1919 J. I. Myerly and the defendants have been in the sole control, occupancy, and possession of the property in controversy lying between Lakeside Drive and the water's edge for a distance of 100 feet north of the south line of Lot 1. Under the record that possession and control has been open, peaceable, notorious, and continuous, in good faith, under color of title and claim of right and title to the entire tract. No one ever challenged that title, control, or possession until plaintiff brought his action.

In support of his contention that the line on Exhibit A, which has been marked x, was placed there when that copy of the original plat was made, notwithstanding that the line on the exhibit is not drawn between and does not connect any perforations on the exhibit, the plaintiff seeks to explain this defect or discrepancy by arguing that the two perforations north of line x and almost half the distance to line o were intended to mark the ends of line x on the plat but were in some way misplaced. This is a mere conjecture without any reasonable basis. Such a misplacement might happen if either the superimposed original plat or the page of the plat book, Exhibit A, underneath, slipped up or down while the perforations were being made. But this could not have occurred. One part of either paper could not slip in any direction without the entire paper slipping, which would misplace all perfora-

tions.. In other words, if the perforations on Exhibit A at the east end of Lots 1, 2, 3, 4, 5, and 6 were misplaced up or down, or north or south, there would be the same misplacement of the perforations at the west end of these lots along Manhattan Boulevard. Even a casual examination of Exhibit A shows that almost every perforation at the west ends of all of the lots in Block B are in perfect position, and that is also true of the perforations in the twenty-two lots in Block C, and elsewhere on the plat. Some perforations may have been made simply to indicate the lake-shore line and others the Lakeside Drive. It is our conclusion that no perforations were ever made to mark the ends of line x on the original plat, since there was no such line on that plat, and consequently no such perforations appear on Exhibit A.

It was the trial court's conclusion that both line o and line x may have been placed on Exhibit A after it was made and filed. This may be true. In fact, line x on Exhibit A has the appearance of having been placed there with different ink, a different pen, and a different hand than were used in drawing other lines of Block B and elsewhere on that exhibit. The same is true of the inside wavy water line along that block, as well as the figures numbering the east parts of the lots in that block.

Plaintiff put in evidence a blueprint of a photograph of the recorded copy of the plat, Exhibit A, which the witness testified was taken about 1915. It showed line x but not line o. However, plaintiff introduced a large blueprint plat of Manhattan Beach showing neither line o nor line x. This was Exhibit J, and it also varied from Exhibit A and Exhibit 2 in not showing the east part of Lot 23 in Block A, across the drive, to have a south boundary. Exhibit 1, a blueprint plat of the beach, did not show line x but did show the said south line of Lot 23 in Block A and also line o. Plaintiff offered testimony by Mr. Carlton, an abstracter, that the latter line had been put on the plat with white ink. Another outline map of the plat, Exhibit E-1, made by Mr. Carlton sometime between 1920 and 1930 and attached to the plaintiff's abstract, showed line x but not line o. That drawers of plats do sometimes inadvertently err in their work is evident from the fact that this exhibit shows two more lots in Block C than appear

in the original plat. This witness, upon whom plaintiff places much reliance, also made a sketch or outline drawing of the plat, which shows line x but not line o. This drawing, according to the witness, was never intended to be an exact duplicate of Exhibit A. Exhibit H, a plat which the county engineer had made between 1930 and 1935, also shows line x but not line o.

These various plat exhibits, relied upon by the plaintiff, do not, in our judgment, aid him in establishing the allegation of his petition that line x is the true south boundary line of Block L. Instead, their definite tendency is to confirm the fact that the most important item of evidence in the determination of the boundary-line issue is Exhibit 2, the original plat of Manhattan Beach. It was wisely said by Justice Evans, in Peck v. Foggy, 199 Iowa 922, 925, 202 N. W. 754, 755, that in reaching a right conclusion, "the first quest of the judicial mind is for anchorage,—something in the record which can be 'tied to' as a *verity;* some fact which is indisputable, or which has been well proved in the record. The *verity* in the record before us is a written lease."

The *"anchorage"* and the "verity" in this case are not the various exhibits above noted and relied upon by plaintiff, but they are to be found in the original plat and other circumstances strongly corroborating and supporting it. While some question was voiced against it, it stands unimpeached. That was the definite conclusion of the trial court. This original plat of the survey plainly shows that no line corresponding to line x was drawn upon it. No stake or monument ever located or marked such a line on the ground. On the other hand, the original plat shows that a line corresponding to line o was drawn upon it and that a permanent stake in the ground marked its location.

We are abidingly satisfied that the south boundary line of Block L and the north boundary line of Lot 1, Block B, of the plat of Manhattan Beach, east of the Lakeside Drive, is a line commencing at a point on the east line of said drive 100 feet north of the south line of said Lot 1, and extending parallel to said south line in an easterly direction to West Okoboji Lake.

Plaintiff calls attention to the statement in Quade v. Pillard, 135 Iowa 359, 363, 112 N. W. 646, 647, that:

"When a recorded plat is referred to in a deed as related to the matter of description, *unless controlled by other facts or circumstances,* such plat is to be considered as furnishing a true description of the property to be conveyed." (Italics supplied.)

There is nothing in this record to definitely indicate that the recorded plat did not contain both lines o and x when plaintiff received his deed. If they did appear, then he had constructive and maybe actual notice that there was a question about the boundary line. But even though the record was not such as to give him notice of any question about the boundary, we hold that the facts and circumstances in this case are such as to bring it within the exception noted by the italicized words, and that the rule contended for by plaintiff is not applicable.

Each party cites a number of boundary-line and adverse-possession cases. A discussion of these cases would be of no benefit. The principles and holdings therein are well understood and do not run counter to our decision in this case.

The plaintiff has known of the control over and possession of the property in dispute by the defendants for many years. He knew of the interest of J. I. Myerly therein. He stood by and watched while this property was being improved by the Myerlys, and brought no action challenging their title or ownership until after the death of J. I. Myerly.

It is our conclusion that the equities are with the defendants and that they are the owners of the property in controversy by chain of title and also by adverse possession for ten and more years.

The decree of the trial court, in all its provisions, is therefore affirmed.—Affirmed.

GARFIELD, C. J., and OLIVER, HALE, WENNERSTRUM, SMITH, MANTZ, and MULRONEY, JJ., concur.

HAYS, J., takes no part.